# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **GOUDY CONSTRUCTION, INC.,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| v. | } Case No.: 2:19-CV-1303-RDP |
| | } |
| **RAKS FIRE SPRINKLER LLC, et al.,** | } |
| | } |
| **Defendants.** | } |

## MEMORANDUM OPINION

This case is before the court on Defendant Aegis Security Insurance Company's Motion to Strike or in the Alternative, Motion to Dismiss the Bad Faith Claim. (Doc. # 4). The Motion is fully briefed and ripe for review. (Docs. # 4, 11, 15, 16, 17, 18, 19, 22). After careful consideration, the court concludes that Defendant's Motion (Doc. #4) is due to be granted.

**I. Background[1]**

Plaintiff Goudy Construction, Inc., ("Plaintiff" or "Goudy") is a construction company located in Bessemer, Alabama. (Doc. # 1, Exh. A ¶1). In 2017, Defendant Raks Fire Sprinkler, LLC, ("RAKS") submitted a bid to install a fire sprinkler system on a project where Goudy was the General Contractor. (*Id.* at ¶9). Defendant Romero Ali is the managing member and incorporator of RAKS. (*Id.* at ¶3).

Goudy accepted RAKS' bid and they entered into a contractual agreement on August 21, 2017. (*Id.* at ¶9). As part of the agreement RAKS was required to provide commercial liability insurance in the amount of $2,000,000 for the duration of the project. (*Id.*). In addition, RAKS was

---

[1] For purposes of ruling on Defendant's Motion to Dismiss, the court treats the factual allegations of the Complaint (Doc. # 1, Exh. A) as true, but not its legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009).

required to provide a performance bond with Goudy listed as the owner, and a labor and material bond with Goudy listed as the owner. (*Id.* at ¶10). RAKS complied with Goudy's requirements and purchased both bonds from Defendant Aegis Security Insurance Company ("Aegis). (*Id.* at ¶11). After receiving approval on the design specifications for the installation of the fire sprinkler system, RAKS began the installation. (*Id.* at ¶13–14).

However, after the installation began, RAKS fell significantly behind on the scheduled progress dates. (*Id.* at ¶15). In addition, RAKS began to experience payroll changes and failed to make timely payments to its employees. (*Id.* at ¶16). Due to their failure to make payments, RAKS was not in compliance with its union contracts. (*Id.*). These financial challenges spurred RAKS to request that Goudy make payments due to RAKS under the contract directly into RAKS' payroll account.[2] (*Id*. at ¶17). Goudy complied with this request and made all remaining payments due to RAKS into their payroll account. (*Id.*)

In order to receive their scheduled payroll draws, RAKS employees, at the direction of Romero Ali, represented that the agreed upon design specifications were being followed and installation deadlines were being met. (*Id.* at ¶18). Meanwhile, RAKS continued to fall behind on the established timeline for the project. (*Id.* at ¶19). RAKS was given a warning with a final demand for performance on February 13, 2018. On November 6, 2018, RAKS left the job site and did not return. (*Id*. at ¶20).

Goudy attempted to communicate with RAKS via e-mail and phone to no avail. (*Id.* at ¶21). On November 26, 2018, Goudy sent correspondence to RAKS by certified mail, requesting that they return and finish installing the sprinkler system. (*Id.*). RAKS failed to respond. (*Id*. at ¶22). After RAKS failed to respond, Goudy informed RAKS' insurer their failure to perform the

---

[2] The communications took place via conversations between Goudy's bonding agent, Clay Foltz, and RAKS. (Doc. # 1, Exh. A at ¶17).

installation as contracted. (*Id.*). Goudy subsequently filed a formal claim with the insurance company on November 13, 2019. (*Id.* at ¶22). Goudy later learned that RAKS lost its liability insurance shortly after beginning the project. (*Id.* at ¶24). Goudy also filed a formal claim with Aegis. (*Id.*) Goudy provided Aegis with documentation of RAKS' incomplete installation, as well as other proof and evidence that RAKS' work was performed in direct conflict to the approved design specifications. (*Id.* at ¶23).

After more than sixty (60) days elapsed, Aegis began an investigation of RAKS' performance. (*Id.* at ¶25). On March 8, 2019 Aegis denied Goudy's claim based upon RAKS' execution of a "Final Waiver and Release of Lien." (*Id.* at ¶26). According to Aegis, the waiver and release represents Goudy's acceptance of RAKS' performance under the contract. (*Id.*).

On July 9, 2019 Goudy commenced the instant case in the Circuit Court of Jefferson County, Bessemer Division, Alabama, alleging negligence, breach of contract, fraud/misrepresentation against RAKS (and presumably Romero Ali), as well as breach of contract and bad faith against Aegis.[3] (Doc. # 1, Exh. A). On August 14, 2019, Aegis timely removed the case to the United States District Court for the Northern District of Alabama, Southern Division. (Doc. # 1 at 2–3). Subsequently, Aegis filed a Motion to Strike, or in the Alternative, Motion to Dismiss the Bad Faith Claim. (Doc. # 4)

## II. Standard of Review[4]

The Federal Rules of Civil Procedure require only that the complaint provide "a short and

---

[3] *Goudy Construction, Inc., v. RAKS Fire Sprinkler, Romero Ali, Aegis Security Company and Fictitious A-C*, Civil Action No. CV-2019-900586.

[4] Defendant's Motion is titled "Motion to Strike or in the Alternative, Motion to Dismiss the Bad Faith Claim." (Doc. # 4). Defendant argues that Plaintiff has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6). Thus, the appropriate framework for evaluating Defendant's Motion is Rule 12(b)(6). A Rule 12(f) analysis is inappropriate because Plaintiff has not pleaded an "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).

plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Having said that, the complaint must include enough facts "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards, nor do pleadings suffice that are based merely upon "labels and conclusions" or "naked assertion[s]" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

In deciding a Rule 12(b)(6) motion to dismiss, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556.

The Supreme Court has recently identified "two working principles" for a district court to use in applying the facial plausibility standard. First, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions when they are "couched as [] factual allegation[s]." *Iqbal*, 556 U.S. 679. Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* The Court has also instructed that application of the facial plausibility standard involves two steps. Under prong one, the court must determine the scope and nature of the factual

allegations that are well-pleaded and assume their veracity; and under prong two, the court must proceed to determine the claim's plausibility given the well-pleaded facts. That task is context specific and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the district court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claims are due to be dismissed. *Id.*

## III. Analysis

The Supreme Court of Alabama first recognized the tort of bad faith in *Chavers v. National Security Fire & Casualty Co.*, 405 So. 2d 1 (Ala. 1981). In *Chavers,* the court recognized the tort of bad faith in the context of first-party insurance claims.[5] *Id.* at 6 ("[W]e recognize the intentional tort of bad faith in first party insurance actions."). Less than a year after *Chavers*, the Alabama Supreme Court announced the elements of a claim for bad faith in *National Security Fire and Casualty Co. v. Bowen*:

> (a) an *insurance contract* between the parties and a breach thereof by the defendant; (b) an intentional refusal to pay the insured's claim; (c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); (d) the insurer's actual knowledge of the absence of any legitimate or arguable reason; (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

417 So. 2d 179, 183 (Ala. 1982) (emphasis added). In *Bowen,* the court stated that "[a] plaintiff in a 'bad faith refusal' case has the burden of proving . . . an insurance contract between the parties and a breach thereof by the defendant[.]" *Id.* A few months later, and consistent with *Bowen*, the Alabama Supreme Court reaffirmed the requirement of a first-party insurance contract for a bad

---

[5] First-party insurance is insurance that is purchased to cover the insured against losses suffer by the policy holder. *See Chavers*, 405 So. 2d at 5–6. Likewise, first-party insurance claims involve a direct claim by between the insurer and the insured. *Id.*

5

faith claim. *National Security Fire and Casualty Co. v. Dutton*, 419 So. 2d 1357, 1361–62 (Ala. 1982). Thus, the plausibility of Defendant's Motion hinges on whether the performance bond is construed as an insurance contract under Alabama law.

Predictably, Defendant Aegis argues that the Alabama Supreme Court, in *Chavers* and its progeny, has repeatedly refused to extend the tort of bad faith beyond that of first-party insurance claims. (Docs. # 4, 11, 16). Plaintiff contends the performance bond issued by Aegis is an insurance contract under Alabama law, and as such, its claim for bad faith survives. (Docs. # 15, 17). Because the tort of bad faith requires "an *insurance contract* between the parties and a breach thereof by the defendant" the court must determine, as a threshold matter, if the performance bond issued by Aegis constitutes "insurance" under Alabama law. *Bowen*, 417 So. 2d at 183.

In *Pearlman v. Reliance Insurance Co*, the United States Supreme Court noted "the usual view, grounded in commercial practice, [is] that suretyship is not insurance." 371 U.S. 132, 140 n.19 (1962). In line with the Supreme Court's statement in *Pearlman*, there are two district court decisions from courts within the Eleventh Circuit that are instructive on this issue. The first, from the Middle District of Alabama, *Amwest Surety Insurance Co. v. Pittsburg Tank & Tower Co., Inc.*, contains facts analogous to the instant case. (Doc. # 11, Exh. A at 2). [6] In *Amwest*, a subcontractor provided a performance bond to the general contractor, with Amwest listed as surety. (*Id.*). A dispute arose concerning the subcontractor's performance under the contract and the general contractor notified Amwest that the subcontractor was in default. (*Id.*). The general contractor demanded that Amwest pay for the completion of the subcontract pursuant to the performance bond. (*Id.*). To determine their obligations under the performance bond, Amwest

---

[6] The opinions for *Amwest Surety Insurance Co. v. Pittsburg Tank & Tower Co., Inc*., and *Sprinkler Contractors, Inc., v. United States Fidelity and Guaranty Company*, are not available on Westlaw, Lexis Nexis, or the court's online CM/ECF system. The cases were provided by Defendants in an Exhibit filed in support of their Motion to Dismiss. (Doc. # 11, Exh. A–H). There is no issue about the authenticity of these decisions.

filed a complaint for declaratory judgment. (*Id*.). The general contractor filed a counterclaim against Amwest, seeking, among other things, damages for bad faith. (*Id.*).

In the court's analysis, Judge Albritton reiterated the Supreme Court of Alabama's restriction of the tort of bad faith to first-party insurance contracts. (*Id.* at 3). "This court will not expand the tort beyond the scope recognized by Alabama state law and, specifically will not extend it to this case involving a surety bond." (*Id.* at 3). In conclusion, the court held that "a surety bond is not an insurance contract and [] a breach of a surety bond cannot give rise to the so-called 'tort of bad faith.'" (*Id.* at 3).

The second decision, from the Northern District of Alabama, *Sprinkler Contractors, Inc., v. United States Fidelity and Guaranty Company,* was authored by Judge Acker of this court. (Doc. # 11, Exh. B). The court considered a factually similar situation regarding an alleged breach of a surety agreement. (*Id.* at 1). In *Sprinkler Contractors*, Judge Acker discussed the application of *Chavers* and the state court's subsequent narrowing of the applicability of the tort of bad faith. (*Id.* at 2). "It is apparent that the Supreme Court of Alabama, rather than expanding the concept of 'bad faith' beyond insurance claims, has gradually narrowed the application of the tort and has retreated from the broad language originally used in *Chavers*, to define the tort." (*Id.* at 3) (citing *Dutton*, 419 So. 2d at 1362; *Bowen,* 417 So. 2d at 183). Ultimately, the court held "that the bad faith claim asserted by the plaintiff is not based upon an insurance contract" and, as such, did not give rise to a claim for the tort of bad faith. (Doc. # 11, Exh. B at 3).

Since *Amwest* and *Sprinkler Contractor*s, the Alabama Supreme Court has repeatedly refused to extent the tort of bad faith to any situation other than a dispute involving a first-party insurance contract. *Kennedy Elec. Co. v. Moore-Handley, Inc.*, 437 So. 2d 76 (Ala. 1983) ("We are not prepared to extend the tort of bad faith beyond the area of insurance policy cases at this

7

time"); *Gaylord v. Lawler Mobile Homes, Inc.*, 477 So. 2d 382, 383–84 (Ala. 1985) (holding that summary judgment on a sales contract was proper as to the bad faith claim because"[t]he tort of bad faith has been recognized in this state only within the insurance policy context*."); see also Raybon v. Allstate Ins. Co.*, 589 So. 2d 710 (Ala. 1991) (contract remedy is the only remedy available where an insurer wrongfully conceals, terminates or repudiates a contract of insurance).

Plaintiff relies on *Ruffin Building Systems, Inc., v. Fort Walton Beach Steel, Inc*, an unpublished opinion from the Southern District of Alabama.[7] No. 91-0149-MC, 1992 U.S. Dist. LEXIS 12119 (S.D. Ala. July 24, 1992). In *Ruffin*, Magistrate Judge William Cassady concluded that a performance bond is a "contract of insurance." (*Id.* at 15–16). "The undersigned believes that the Alabama Supreme Court would recognize a cause of action for bad-faith refusal of a surety to investigate or pay under a payment bond, even though the person asserting the claim is not a party to the contract." (*Id.*). However, the court clarified this statement and concluded with this prediction: "Alabama [will] recognize the tort of bad faith under the circumstances of this case, [and] [this] Court does nothing more than recognize the trend in other jurisdictions toward this end." (*Id.* at 16). However, in the twenty-seven years following *Ruffin*, the "trend" anticipated by the court simply has not materialized. Thus, this court views the *Ruffin* opinion as an anomaly in light of the numerous opinions issued since 1992 dismissing bad faith claims against sureties.

Plaintiff also argues that sureties have "superior bargaining power" when negotiating

---

[7] Plaintiff also relies on numerous federal and state court cases, all of which were decided on procedural grounds rather than the merits. For example, Plaintiff cites to *Western Surety Co. v. Consolidated Construction Co., Inc.,* for the proposition that a bad faith tort claim against a surety survived a motion to dismiss. 5:06-cv-0183 (N.D. Ala. 2006). However, the surety in that case filed a Motion to Reconsider, which was subsequently granted, and the bad faith claim was dismissed with prejudice. (5:06-cv-0183, Doc. # 54). Similarly, Plaintiff cites *Trawick v. Contractors, Inc. v. Environmental Services, LLC*, for the proposition that a bad faith tort claim against a surety survived summary judgment. 2:00-cv-01661 (N.D. Ala. May 17, 2011). However, the opinion does not include any discussion about the bad faith claim. Rather, the court simply stated that "there is a genuine issue of material fact and that neither party is entitled to judgment as a matter of law on this claim." (2:00-cv-01661, Doc. # 30 at 9). To be clear, the court has not addressed each case cited by Plaintiff. Rather, the court has limited its discussion to those cases that are helpful to resolving the instant case.

surety bonds, and thus, public policy requires a tort remedy. (Doc. # 15 at 6). But, this argument falls flat for two reasons. First, Plaintiff fails to explain the source of Aegis' "superior bargaining power." In fact, Plaintiff glosses over the fact that the company Defendant Aegis was negotiating with is a similarly situated, sophisticated general contractor. *See Boldt Co. v. Thomason Elec. And American Contractors Indem. Co.*, 820 F. Supp. 2d 703, 706 (D.S.C. 2007) ("The projects that sureties are asked to bond are typically those entered into by parties with commercial sophistication, relative parity of bargaining power and ample legal and technical advice to ensure their protection in the contractual documents."). As such, this argument is not persuasive. Second, policy decisions like this -- that is, policy decisions about whether to extend a state law cause of action to situations where there is unequal bargaining power -- are decidedly within the purview of the state supreme court, not a federal trial court.

Finally, Plaintiffs argue that "[t]he state of Alabama regulates the providers of bonds and sureties in the same manner in which it regulates the standard insurance companies because the State legislature intended to treat sureties as insurance providers." (Doc. # 17 at 2). To support this argument Plaintiff argues that sureties are included in the insurance portion of the Alabama Code. According to the Alabama Code, surety insurance includes:

> (1) Fidelity insurance, which is insurance guaranteeing the fidelity of persons holding positions of public or private trust; (2) Insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings and contracts of suretyship; and (3) Insurance indemnifying banks, bankers, brokers, financial or moneyed corporations or associations against loss, resulting from any cause, of bills of exchange, notes, bonds, securities, evidences of debt, deeds, mortgages, warehouse receipts or other valuable papers, documents, money, precious metals, and articles made therefrom, jewelry, watches, necklaces, bracelets, gems, precious and semiprecious stones, including any loss while the same are being transported in armored motor vehicles or by messenger, but not including any other risks of transportation or navigation; also, insurance against loss or damage to such an insured's premises or to his furnishings, fixtures, equipment, safes, and vaults therein caused by burglary, robbery, theft, vandalism or malicious mischief, or any attempt thereat.

9

ALA. CODE. § 27-5-7. Although sureties are addressed within the Alabama code, their inclusion is for regulatory and practical purposes. Because many sureties provide products that can be classified as insurance (e.g., fidelity bonds), their inclusion in the insurance code makes sense. But inclusion in the insurance code is not dispositive, and as previously discussed. numerous Alabama state and federal courts have held that suretyship is not insurance.

**IV.     Conclusion**

As previously stated, "only a complaint that states a plausible claim for relief survives a motion to dismiss[.]" *Iqbal*, 556 U.S. 679. Here, Plaintiff has alleged a cause of action that does not exist under Alabama law. Because this court determines that the well-pleaded facts, accepted as true, do not state a claim that is plausible, the bad faith claim is due to be dismissed. Thus, Defendants' Motion to Dismiss the Bad Faith Claim (Doc. # 4) is **GRANTED.** An Order consistent with this Memorandum Opinion will be entered contemporaneously.

**DONE** and **ORDERED** this December 16, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE